Filed 5/2/13  P. v. Romero CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. STEVEN ROMERO, Defendant and Appellant. | B240180 (Los Angeles County Super. Ct. No. NA088206) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark C. Kim, Judge.  Affirmed with directions.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Steven Romero (defendant) appeals from his murder conviction. He contends that the trial court erred in denying three *Wheeler*/*Batson*[1] motions and in the use of CALJIC Nos. 3.00, 3.01, and 3.02 to instruct the jury. In addition, defendant contends that the jury's findings of guilt and gang motive were not supported by substantial evidence and the cumulative effect of instructional error requires reversal of the judgment. Defendant also asks that we modify the abstract of judgment by striking the sentence enhancement imposed under Penal Code section 667, subdivision (a)(1).[2] We find no merit in defendant's contentions and affirm the judgment. We also direct the trial court to correct clerical errors in the abstract of judgment.

## BACKGROUND

**Procedural history**

Defendant was charged with the first degree murder of Fernando Huerta (Huerta) in violation of section 187, subdivision (a). The information also alleged that the murder was gang related as defined in section 186.22, subdivision (b)(1)(C); that defendant had suffered two prior felony convictions within the meaning of section 667, subdivision (a), and for purposes of the "Three Strikes" law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)); and that he served two prior prison terms within the meaning of section 667.5, subdivision (b).

Defendant waived his right to a trial on the allegation of prior convictions and admitted them. The jury found defendant guilty of first degree murder as charged and found true the gang allegation. On March 16, 2012, the trial court sentenced defendant to a total term of 55 years to life in prison, comprised of 25 years to life for murder, doubled as a second strike, plus five years due to one of the prior felony convictions. The court stayed the gang enhancement and awarded 778 actual days of custody credit. The court

---

[1]    See *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79, 89 (*Batson*); and see discussion, *post*.

[2]    All further statutory references are to the Penal Code, unless otherwise indicated.

also ordered defendant to pay mandatory fines and fees and to provide a DNA sample. Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

Just before 11:00 p.m. on April 12, 2006, musician Reyes Serrano (Serrano) was sitting in his truck, taking a break between sets at the Los Potros restaurant in Long Beach, when he saw a gold car park next to him. A Hispanic man with a cell phone to his ear got out of the gold car and went to a corner of the parking lot where a black SUV pulled up close to him, about 40 feet from Serrano's truck. Serrano then saw another man, later identified as Huerta, come out of the restaurant with a cell phone to his ear. As Huerta walked further into the parking lot, Serrano saw four Hispanic men exit the black SUV and approach Huerta. Serrano then heard the sound of many shuffling feet from the area of the SUV, saw what appeared to be a fight, and then saw Huerta limping quickly back toward the restaurant as the SUV left the parking lot at a high rate of speed, followed by the gold car. A woman yelled out, "Call an ambulance," as she helped Huerta to the ground in the doorway of the restaurant.

Huerta died that night as a result of multiple stab wounds. Along with nonfatal wounds, Huerta was fatally stabbed twice in the chest by a single-edged blade, possibly scissors, which penetrated his heart. Some other smaller blade, possibly a knife, was used to inflict cuts in Huerta's back. The police recovered a pair of bloody scissors in the parking lot of the restaurant and blood was later recovered from the shoe of suspect Jose Ceja (Ceja). Huerta's blood provided DNA which was found to match the DNA in the blood on the scissors and on Ceja's shoe.

Homicide detectives interviewed Nicholas Canales (Canales) on April 27, 2006, 15 days after the murder. At trial, Canales a reluctant, prosecution witness, admitted that he was once a member of the East Side Longo (ESL) gang of Long Beach, and that he knew defendant and Ceja. In 2008, Canales testified against Ceja, whom he knew as "Perico" and was thereafter beaten. The beating resulted in a head wound requiring 89 stitches, leaving a visible scar. After a series of evasive answers, a recording of the police interview was played for the jury.

3

In the interview, Canales told the detectives that "Massive," another member of the ESL gang, came to his home one afternoon and told Canales that his friends Perico and "Capone" had "shanked some fool up" and needed a place to stay. Canales identified Capone as defendant and a member of the Malditos clique of the ESL gang. He told the detectives that Ceja was also a member of ESL, but belonged to the Barrio Viejo clique. Canales knew the manager of the building across the street from his and arranged for defendant and Ceja to spend the night in an empty apartment there. Later that evening in the apartment defendant told Canales that he, defendant, had "shanked some fool," a member of Barrio Small Town (BST), another Long Beach gang. Defendant said that he intended to leave town for Las Vegas, that he was concerned because he had dropped his knife while running away, and he hoped that he wiped the knife before it dropped. Defendant also told Canales that Ceja was with him, but did not say where the stabbing took place.

Canales saw defendant and Ceja again the next morning before they left. Later, Canales received a message on his home answering machine in which defendant said that if anyone needed to reach him or send him clothes, to contact "Gabby."[3] Canales identified Gabby as defendant's girlfriend, Gabriella Sanchez (Sanchez).

Sanchez testified that defendant was her boyfriend in 2006. He was a member of the Malditos clique of the ESL gang, and she knew him as Stevie or Capone. Sanchez was also acquainted with Ceja and had seen him with defendant on several occasions. Sanchez was familiar with several of defendant's tattoos and she explained that the "C" and "K" on his calves stood for "Crip Killer" (although she denied this on cross-examination). Sanchez was also a reluctant witness, and gave a series of evasive answers. She denied she was afraid, but admitted she did not want to testify and could be hurt or killed for doing so. Sanchez explained several slang terms commonly used by

---

[3]     When the detectives were unable to retrieve the telephone message, Canales told them that his wife had erased it.

4

gang members, such as "jura" for the police and "throwing a rat on somebody" for being a witness against someone.

Long Beach Police Officer Daniel Mendoza was a homicide detective in 2006 and interviewed Sanchez while investigating this case. Sanchez told Officer Mendoza that defendant belonged to the Malditos clique of the ESL gang at that time. She said that defendant had telephoned her and said he was frightened because the police were looking for him and Ceja, and that the "hood" was upset at defendant, Perico, and the others involved in a stabbing in which a member of the ESL gang had been killed.[4] Defendant told Sanchez that he hoped that no one from the hood would throw a rat on him. Sanchez told Officer Mendoza that later, sometime around Mother's Day, she met defendant for tacos in Tijuana, Mexico.

Jessica Preli, the manager of the apartment building where Canales arranged for defendant and Ceja to spend the night, testified that the building was in the neighborhood claimed by the ESL gang. She knew Canales as a member of that gang and occasionally allowed him to use empty apartments for his fellow gang members in order to avoid conflict with his gang. Preli also knew defendant as a gang member whose name was Stevie or Capone. The night of April 13, 2006, after giving Canales permission for defendant to stay in one of the empty apartments, Preli saw defendant on the balcony. The next morning, she overheard defendant on the telephone saying that he needed money to go to Mexico, that the police might be looking for him, and that it was getting too "hot" in Long Beach.

In December 2009, defendant was arrested in Mexico, turned over to American authorities, and brought back for trial. As Officer Mendoza drove him from the border, defendant asked how Officer Mendoza had picked up his trail. As he was being booked, defendant admitted he was a member of the Malditos clique of the ESL gang.

---

**4**      Officer Mendoza, who would have been aware of any other stabbing death in Long Beach in April 2006, testified that Huerta's murder was the only one.

Detective Tim Olson testified that he and his partner, Detective Anguiano, arrested Ceja about one week after Huerta's death. Ceja admitted he was a member of the ESL gang and that his gang moniker was Perico. Detective Olson had worked with the Long Beach Police Department gang unit for 10 years and had expert knowledge of the ESL gang. In his opinion Ceja was a member of the ESL gang. He identified Ceja's tattoos in photographs and explained that they demonstrated his membership in the Barrio Viejo clique of the ESL gang.

A few months before Huerta's death, Detective Olson arrested defendant in an unrelated incident. At that time, defendant admitted he was a member of the ESL gang and that his gang name was Capone. Detective Olson had also stopped defendant in 2005. On both occasions, Detective Olson observed tattoos which identified defendant with the ESL gang. During the 2006 arrest, Detective Olson noticed that a "Longo" tattoo had been added since the 2005 encounter. He also explained that the initials "C" and "K" stood for Crip Killer.

Long Beach Police Sergeant Cory Brown testified that while on patrol in 2002, he issued a citation to defendant who was in Ceja's company. Officer Udom Sawai testified that when he stopped defendant in traffic in 2002, Ceja was in the front passenger seat. When he and his partner booked the two men, Officer Sawai observed that Ceja had ESL and Barrio Viejo tattoos.

Long Beach Police Detective Chris Zamora testified as the prosecution's gang expert. He had spent most of his career investigating the criminal activities of the ESL gang, the largest Hispanic gang in Long Beach with about 900 members. Subgroups or cliques of the ESL gang included the Malditos and Barrio Viejo. Members of the two cliques associated routinely with one another.

Detective Zamora testified that the gang's territory was located primarily in central Long Beach, but had expanded over the years to include almost the entire city. He explained that territory was established and expanded by intimidating the community and other gang members with violence, followed with gang graffiti and more criminal activity. Detective Zamora explained that the concepts of fear and respect were very

6

important in gang culture and in the ESL gang in particular. Openly committing violent crimes and threats helped the gang maintain and control its territory by discouraging people from calling the police or cooperating with law enforcement.

The primary activities of the ESL gang were narcotics sales, physical assaults, hate crimes, assaults with a deadly weapon, gang shootings, gang murders, and attempted murders. The gang's other common criminal activities included auto theft, burglary, home invasion robberies, carjacking, and possession of illegal weapons. Detective Zamora presented the certified convictions of two active members of the ESL gang: Genaro Zaragoza, who committed an assault with a firearm in 2004; and Angel Ramirez, who committed attempted murder in 2004.

Many Hispanic gangs, including the ESL gang, are aligned with the Mexican Mafia prison gang which has established a code of conduct for its affiliated gangs. The most serious rule violation is "snitching," meaning cooperating with law enforcement in any way, and a gang discourages cooperation with law enforcement by punishing the "snitch," whether or not a member of the gang. Punishment can range from intimidation or physical assault to murder. Detective Zamora spoke to Canales after his beating. Canales reported that he had been "jumped" by ESL members due to his testimony, and he believed Ceja had placed him on the "green light" list for punishment. Canales told Detective Zamora that Ceja had said, "I wish they had done a better job on your head," which Canales understood as a threat because Ceja was a high-ranking member of ESL. When Detective Zamora told Canales that defendant would be in the courtroom when he testified, Canales put his head down.

Detective Zamora expressed his opinion that defendant and Ceja were both active ESL gang members, that defendant was a member of the Malditos clique and that Ceja's clique was Barrio Viejo. His opinion was based on information gained during the investigation of this case, his prior contacts with them and his observation of their gang related tattoos, as well as Detective Zamora's communication with other law enforcement officers. Defendant and Ceja were known as "road dogs," meaning fellow gang members

7

who were friends and who had been previously contacted in each other's company by law enforcement officers.

Detective Zamora was familiar with Los Potros restaurant, which was located within ESL territory and was the site of regular narcotics trafficking. He testified that circumstances in which a gang member would kill another member of his own gang included rivalry between junior and senior factions, competition for narcotics distribution, and rule violations.

The prosecution gave Detective Zamora the following hypothetical facts: in ESL territory, ESL road dogs shank a fellow gang member in the parking lot outside a restaurant known for narcotics trafficking. The prosecutor then asked for Detective Zamora's opinion whether such a crime would be committed for the benefit of, in association with, or at the direction of the ESL gang. Detective Zamora had no doubt the crime was committed in association with the gang, as at least two members committed the crime together. He was also of the opinion that the crime was committed at the direction of the gang and for that gang's benefit. The basis of his opinion was that the crime was a violent act, committed in gang territory by members of the same gang acting together. Such a crime would instill fear in the community and in rival gangs; and if the victim was a rule violator, it would help to maintain discipline within the ESL gang.

**Defense evidence**

Defendant called Canales, who testified he was not married in 2006 and did not have an answering machine at home. Before speaking to the detectives in this case, Canales was arrested for discharging a firearm and would have gone to prison on the charge, but police said they would take care of it. The police told Canales if he cooperated he would be placed on probation. Canales agreed to cooperate and to enter a plea in exchange for probation, which he later violated and was sent to prison. Canales claimed not to remember arranging for an apartment for defendant; that defendant said he had shanked someone; or that Canales told the police of defendant's statement.

8

## DISCUSSION

### I. *Wheeler/Batson* motions

Defendant contends that the trial court erred in denying three *Wheeler/Batson* motions, made on the ground that the prosecution had used peremptory challenges to exclude an African-American prospective juror (Juror No. 4670) and two Hispanic prospective jurors (Jurors No. 7651 and 6924), resulting in a violation of defendant's right to a fair trial and impartial jury under the United States and California Constitutions.

The use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias violates both the state and federal Constitutions. (*Wheeler, supra*, 22 Cal.3d at pp. 276-277; *Batson, supra*, 476 U.S. at p. 89.) In reviewing a *Wheeler/Batson* motion, the trial court engages in a three-step inquiry: the first requires the objecting party to make a prima facie showing of prohibited group bias; in the second, the burden shifts to the party who exercised the peremptory challenge to articulate a nondiscriminatory reason; and in the third step, the court determines whether the objecting party has established purposeful discrimination. (*People v. Silva* (2001) 25 Cal.4th 345, 384; *Purkett v. Elem* (1995) 514 U.S. 765, 767.) "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike. [Citation.] The three-step procedure also applies to state constitutional claims. [Citations.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*); see also *Johnson v. California* (2005) 545 U.S. 162, 170-171.)

In this case, the trial court asked the prosecutor to articulate a nondiscriminatory reason for challenging the three jurors without ruling that defendant had made a prima facie showing of prohibited group bias. The first step is thus considered moot and we "'skip to *Batson's* third stage to evaluate the prosecutor's reasons for dismissing [the three] prospective jurors.' [Citations.]" (*People v. Riccardi* (2012) 54 Cal.4th 758, 786-787 (*Riccardi*).)

The trial court's determination that the prosecution's motive for the challenge was nondiscriminatory presents a question of fact, which we review using the substantial evidence standard. (*Hernandez v. New York* (1991) 500 U.S. 352, 364-365; *Lenix, supra,*

9

44 Cal.4th at pp. 613-614.) "We review a trial court's determination regarding the sufficiency of a prosecutor's justification for exercising peremptory challenges '"with great restraint."' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) The trial court's ruling will not be overturned on appeal unless it is shown to be clearly erroneous. (*Riccardi*, *supra*, 54 Cal.4th at p. 787.)

### A. Juror No. 4670

Defendant contends that the trial court erred in finding his motion untimely with regard to Juror No. 4670, and that the court erred in its belief that to make a prima facie showing, defendant was required to show a pattern of discrimination. The trial court did not base its ultimate ruling on either of these two issues; it ruled on the merits of defendant's motion after hearing the prosecutor's reasons. At most, the challenged findings created an ambiguity that we may bypass in favor of the trial court's ruling on the ultimate issue of purposeful discrimination. (See *Riccardi*, *supra*, 54 Cal.4th at pp. 786-787; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1009-1010.) We therefore turn directly to defendant's remaining contention that the trial court failed to make a reasoned evaluation of the prosecution's justification for exercising this peremptory challenge.

When asked to state the reason for challenging Juror No. 4670, an African-American woman, the prosecutor stated that Juror No. 4670 reported a bad experience with the police, and that she had wanted to be a police officer but that did not work out. The prosecutor added: "She's also young and single, which sometimes I'll keep somebody who is young. Sometimes I will keep somebody who is single. But those are factors I take into account. By far the most important factor for me was that she explicitly said she had a bad experience with the police."

10

The trial court found the negative experience with police officers was a sufficient reason. The California Supreme Court has "'repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement.' [Citations.]" (*Lenix*, *supra*, 44 Cal.4th at p. 628.) We also note that peremptory challenges have been deemed appropriate where the prospective juror is immature or single with limited life experience. (*People v. Sims* (1993) 5 Cal.4th 405, 430-431; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1328.)

Defendant contends that the prosecutor's insufficient voir dire regarding Juror No. 4670's police experience demonstrates that his reasons were pretextual. We disagree. The trial court conducted most of the voir dire, limited counsel's questioning, and precluded Juror No. 4670 from providing additional details about her experience. Further, we find that substantial evidence supports the trial court's ruling. Juror No. 4670 stated that she was single and worked as a dispatcher for a security company. Her father was a Los Angeles police officer whose position involved the investigation of gangs and narcotics trafficking. With regard to her negative experience with law enforcement, she reported that while parked in her new car waiting for a friend, Gardena police officers passed her, turned around, approached and rudely questioned her. Later in voir dire, the trial court asked whether anyone had any type of legal training. Juror No. 4670 replied that she had majored in criminal justice, intending to become a police officer, but it had not worked out.

Defendant also contends that a comparison with several seated jurors shows that the prosecutor's reasons were pretextual. Defendant represents that Juror No. 7061 was ultimately seated after revealing that his good friend of 20 years was shot to death during an altercation with a deputy sheriff who claimed that the friend was armed. Juror No. 7061 did not think it likely that his friend had a weapon, but said the matter was still under investigation. Defendant also points out that the Juror No. 7061, like Juror No. 4670, had family in law enforcement; and that although the prosecutor was concerned

11

that Juror No. 4670 was young and single, several other single jurors and alternates were seated.**5**

A "comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Lenix*, *supra*, 44 Cal.4th at p. 622.) Comparisons to accepted jurors may tend to show purposeful discrimination "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241; *Lenix*, *supra*, 44 Cal.4th at p. 621.)

As respondent observes, because defendant did not make a comparative analysis in the trial court, appellate review is necessarily circumscribed. (*Lenix*, *supra*, 44 Cal.4th at pp. 622, 624.) "Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent. [Citation.]" (*Id*. at p. 624; see also *Hernandez v. New York*, *supra*, 500 U.S. at p. 365.)

We note that the trial court ruled with regard to Juror No. 4670 before the cited voir dire responses were elicited from other single jurors. "[T]he trial court's finding is reviewed on the record as it stands at the time the *Wheeler*/*Batson* ruling is made. If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments." (*Lenix*, *supra*, 44 Cal.4th at p. 624.) As defendant did not renew his objection to Juror No. 4670 after hearing that other jurors were single, a comparison is not helpful.

Moreover, defendant's analysis is inadequate. He has failed to identify any seated juror who was young, single, and non-African-American, and who had had a negative experience with law enforcement. Juror No. 7061 was married and apparently not young, as he was the vice president of a construction firm. The age and race of the other single jurors does not appear in the record, and defendant does not point out any responses

---

**5**     Defendant cites Juror No. 1068; Juror No. 8126; Juror No. 8492; (alternate) Juror No. 7858; and (alternate) Juror No. 8200.

indicating a negative experience with law enforcement. As defendant has failed to demonstrate that the proffered reason for striking Juror No. 4670 applies equally to any similar non-African-American seated juror, he has not met his burden to show that the trial court erred. (See *Lenix*, *supra*, 44 Cal.4th at pp. 621-622.)

### B. Juror No. 7651[6]

Defendant contends that the prosecutor's proffered reason for dismissing Juror No. 7651 was implausible and not subjectively genuine. The critical question in determining whether the prosecutor's proffered reason was genuine is credibility, measured by factors that include the prosecutor's demeanor, which the trial court is in a better position than the reviewing court to evaluate; we thus treat the issue as one of fact entitled to great deference. (*Riccardi*, *supra*, 54 Cal.4th at p.787, quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 338-339.)

Juror No. 7651 was a Hispanic woman who stated she had a close friend who had been charged with rape and convicted under a plea bargain, and she had spoken to his mother about the charge. When the court asked whether Juror No. 7651 had an opinion as to whether her friend had been treated fairly by police officers or the court, she responded that she had no opinion because she did not know the facts. The prosecutor explained that he did not believe the prospective juror had no opinion about such a serious charge against a close friend. He added, "I'm concerned that she is going to have a prejudice against the criminal justice system as a result."

Defendant claims that the prosecutor's explanation included purported statements that Juror No. 7651 did not make. Defendant is apparently referring to defense counsel's complaint to the trial court that Juror No. 7651 did not say she would be prejudiced by the incident. The prosecutor was not required to show that the juror was in fact prejudiced or that she admitted her prejudice. "'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.'

---

**6** In his opening brief (but not the reply brief), defendant inadvertently refers to Juror No. 7651 as Juror No. 7861.

13

[Citation.]" (*Lenix*, *supra*, 44 Cal.4th at p. 613, quoting *People v. Arias* (1996) 13 Cal.4th 92, 136.)

Defendant also contends that a comparison between Juror No. 7061 and Juror No. 7651 shows that the prosecutor's justification should not have been believed because Juror No. 7061 had expressed skepticism that his friend was armed at the time he was shot by a deputy sheriff. We note once again that defendant did not ask for a comparison in the trial court and that he points to no similarities in the two jurors' responses other than each had an acquaintance accused of committing a crime. In fact, the differences are notable. Juror No. 7061 was forthcoming with his thoughts about his friend's death and was aware of the facts surrounding the event. Unlike Juror No. 7651, he did not claim to have no opinion or knowledge about a serious incident in a close friend's life. Although he expressed skepticism about the presence of a weapon, Juror No. 7061 knew his friend had been in a single-car accident, that there had been an altercation with the police, and that the matter was under investigation.

The prosecutor was not required to believe Juror No 7651's "assurance that, despite an answer indicating the contrary, she would have no problem being neutral." (*People v. Rushing* (2011) 197 Cal.App.4th 801, 812.) We conclude that substantial evidence supports a finding that the prosecutor's concerns regarding Juror No. 7651's sincerity was credible and genuine. We thus defer to the trial court's evaluation.

### C. Juror No. 6924

Defendant objected to the prosecution's peremptory challenge to Juror No. 6924, claiming that she was the fifth Hispanic juror to be challenged. The trial court did not think her name was Hispanic but asked the prosecution to provide a reason. The prosecutor explained that the subject juror had a religious objection to judging people, and although she said could probably render a guilty verdict, it was clear that she was

14

reluctant. The trial court agreed and found the reason might have even justified a challenge for cause and was thus not based upon race or ethnicity.[7]

Defendant contends that *Wheeler* prohibits peremptory challenges based solely upon a prospective juror's religious beliefs. A peremptory challenge based solely on membership in an identifiable religious group may be unjustified. (*Wheeler*, *supra*, 22 Cal.3d at pp. 276-277; see *People v. Johnson* (1989) 47 Cal.3d 1194, 1217, fn. 3.) However, *Wheeler* does not preclude a peremptory challenge on the basis of a juror's relevant personal values "even though those views may be founded in the juror's religious beliefs." (*People v. Martin* (1998) 64 Cal.App.4th 378, 385; see also *People v. Rushing*, *supra*, 197 Cal.App.4th at p. 812.)

Here, substantial evidence supports the prosecutor's nondiscriminatory reason based upon the juror's religious beliefs. Juror No. 6924 expressed doubt concerning her ability to find the defendant guilty if the prosecution met its burden of proof, explaining that she did not feel comfortable judging others. She later stated, "I shouldn't be judging other people. It's just up to God. He's the only one that punishes us. Whatever you have done, he punishes you when it's your time." Asked whether she had a religious objection to rendering a guilty verdict because it meant that she was sitting in judgment of another person, Juror No. 6924 replied, "Yes."

Defendant contends that despite Juror No. 6924's uncertainty, the trial court was required to disallow the challenge, because she stated she could properly serve as a juror. We disagree. The prosecutor's reason for a peremptory challenge need not support a challenge for cause. (*Lenix*, *supra*, 44 Cal.4th at p. 613.) Nor must the prosecutor believe a juror's claim of impartiality. (*People v. Rushing*, *supra*, 197 Cal.App.4th at p. 812.)

---

[7] The prosecutor challenged Juror No. 6924 for cause, but the trial court overruled the challenge after she stated that she could vote guilty if persuaded by the evidence, or not guilty as appropriate, so long as it was the court that passed sentence.

15

Moreover, the prosecutor had good reason to doubt Juror No. 6924's claim that she could properly serve. Before overruling the prosecutor's challenge for cause, the trial court asked the juror whether she could determine the facts based on the evidence, apply the law as instructed, and come to a conclusion. She replied, "I can do that, but I guess I have mixed --" The court interrupted her at that point and asked whether she could convict defendant if the people proved their case. Again, the juror used the expression, "I guess," and then added, "Yes. Because you will be the one giving the sentence. So I can just say whether I feel he's guilty or not guilty." As Juror No. 6924's uncertainty and reluctance are apparent from her choice of words, despite her assurance that she could render a guilty verdict, we conclude that substantial evidence supported the court's finding that the prosecution sincerely believed in her reluctance to serve.

## II. Substantial evidence

Defendant contends that the evidence was insufficient to support his conviction on a theory of aiding and abetting and that the evidence was insufficient to support the gang finding.

The conviction and the gang enhancement finding are reviewed under the same substantial evidence standard. (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.) We review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid*.) Further, we do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial

16

evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### A. Aiding and abetting

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) Knowledge and intent are rarely susceptible of direct proof and generally must be established with reasonable inferences drawn from circumstantial evidence. (See *Id.* at pp. 558-559.) It is unnecessary to prove advance knowledge of the perpetrator's purpose, and intent may be formed instantaneously at the time of the commission of the crime. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 532.) Mere presence at the scene of the crime and a failure to take action to prevent it are not determinative factors by themselves, but will tend to support a finding of aiding and abetting. (*People v. Durham* (1969) 70 Cal.2d 171, 181.) Other relevant factors include companionship and conduct before and after the offense. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.)

Defendant contends that the evidence of premeditation and deliberation was weak, and thus it was probable that the jury found him guilty as an aider and abettor. He argues that his admissions show only that he might have been an accessory after the fact but no more, and that other evidence showed no more than his possible presence at the scene of the stabbing. Finally, defendant contends that any inference that he knew of or intended to assist in Ceja's criminal purpose was speculative.

Defendant's contentions lack merit. First and foremost, we reject defendant's assumption that the jury convicted him only as an aider and abettor, as the evidence amply supported a finding that defendant was a direct perpetrator who acted with premeditation and deliberation. On the night of the murder, defendant admitted to Canales that he had "shanked some fool," that Ceja was with him, and that he had

17

dropped his knife while running away. Huerta's blood on Ceja's shoe supports that admission and established that defendant's victim was Huerta.

Defendant committed the crime with at least one other person, as shown by Serrano's testimony that he saw four Hispanic men approach Huerta just before he saw what appeared to be a fight, heard shuffling feet, and saw Huerta hurriedly limping back to the restaurant; and by the medical examiner's testimony that two different blades caused Huerta's nine injuries.

The evidence also suggested that defendant and his companions went to the restaurant intending to call Huerta out: the gold car arrived just before the SUV; its occupant waited for the SUV and then made a telephone call; moments later, Huerta emerged from the restaurant with a cell phone to his hear and walked toward the SUV; and a fight or assault ensued. Such evidence of planning activity supported a finding of premeditation and deliberation. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1125.) The repeated stabbing or repeated attempts to stab the victim provided circumstantial evidence of an intent to kill him. (See *People v. Avila* (2009) 46 Cal.4th 680, 701-702.) And it may reasonably be inferred from the multiple stab wounds that the killing was premeditated. (See *People v. Pride* (1992) 3 Cal.4th 195, 247.)

In sum, substantial evidence showed that defendant and Ceja each used a sharp object to stab or cut Huerta nine times, and such evidence gave rise to the reasonable inference that each man harbored a premeditated intent to kill.

Thus the evidence established much more than defendant's mere presence at the scene or assistance after the fact. It showed that he arrived with Ceja and others who intended to call Huerta out, and that he directly participated in repeatedly stabbing or attempting to stab Huerta. As defendant and Ceja each acted in concert with the other to attack Huerta with an apparent intent to kill him, it follows that when defendant assisted Ceja in the attack he knew of and shared Ceja's unlawful purpose, as required for aider and abettor liability. (See *People v. Beeman*, *supra*, 35 Cal.3d at p. 561.) Defendant's contention that insufficient evidence supported a finding of guilt either as a direct perpetrator as an aider and abettor is without merit.

18

### B. Gang finding

A gang finding has two prongs: (1) the crime was committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) the crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1); *People v. Albillar* (2010) 51 Cal.4th 47, 61, 67-68 (*Albillar*).) The first prong is satisfied with substantial evidence that the defendant committed the crime in concert with a known gang member; and the jury may reasonably infer the second prong from substantial evidence that the defendant intended to commit the crime with the other gang member. (*Albillar*, *supra*, at p. 68; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

Defendant does not deny that the ESL gang was shown to be a criminal street gang, as defined in section 186.22, subdivision (e).[8] He contends that the prosecution was required to prove that his motive for the attack was to benefit his gang or that the crime did in fact, benefit his gang. He points to evidence indicating that the crime did not benefit the gang: Huerta was an ESL member; it was a violation of gang code to kill a member of one's own gang unless sanctioned by the gang; and the "hood" was upset with defendant over the incident.

Defendant cites no authority requiring proof that a crime was sanctioned by the gang, and he is mistaken in his assumption that a motive to benefit the gang was required. The statute states the requirement in the disjunctive; thus the crime must have been committed *either* for the benefit of, (2) at the direction of, *or* (3) in association with a gang. (*People v. Leon* (2008) 161 Cal.App.4th 149, 162.) The second alternative may be established with substantial evidence of the intentional commission of the crime in

---

[8] Gang expert Detective Zamora testified that ESL had over 900 members and that its primary activities included murder, attempted murder, and assault with a deadly weapon. He described the gang's common names and identifying signs, and presented certified conviction records to support his opinion that its members engaged in a pattern of criminal gang activity. This element was thus sufficiently established. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619, 624-625.)

19

association with a known gang member.  (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198; see *Albillar*, *supra*, 51 Cal.4th at pp. 61, 67-68.)

The evidence was sufficient here.  We have already found substantial evidence to support a finding that defendant and Ceja committed the crime together and that defendant harbored the intent to kill Huerta.  Defendant does not contend that the evidence was insufficient to show that he and Ceja were both gang members or that he knew Ceja was a gang member when they committed the crime.  Indeed, fellow ESL gang member Canales identified defendant and Ceja as members of his gang, albeit of different cliques.  Sanchez, defendant's girlfriend at the time of the crime and who was also acquainted with Ceja, testified that they were both ESL gang members.  As defendant was being booked on this charge, he admitted being a member of the Malditos clique of the ESL gang.  As defendant was being booked on a different charge a few months before Huerta's murder he admitted being a gang member.  Defendant could not have been ignorant of Ceja's gang membership, as they had been "road dogs" since at least 2002, and Ceja had sported ESL-related tattoos since that time.

We conclude that substantial evidence supported both prongs of section 186.22, subdivision (b)(1):  (1) defendant committed the crime in association with a criminal street gang by attacking Huerta in concert with a known gang member; and (2) defendant committed the crime with the specific intent to assist in criminal conduct by Ceja, another gang member.  (See *Albillar, supra*, 51 Cal.4th at p. 68; *People v. Villalobos*, *supra*, 145 Cal.App.4th at p. 322.)

### C.  Five-year enhancement

Defendant contends that if the gang enhancement is upheld, the five-year enhancement imposed under section 667, subdivision (a)(1), must be stricken because section 186.22, subdivision (b)(5), prescribes a minimum parole period of 15 years.  Defendant provides no argument or explanation for this contention and cites no authority.  Respondent ignores the issue entirely.

We find no error in imposing the five-year enhancement, but note that the abstract of judgment fails to reflect the trial court's oral pronouncement of sentence.  The trial

court sentenced defendant to a total term of 55 years to life in prison, comprised of 25 years to life for murder, doubled to 50 years as a second strike, plus five years due to one of the prior felony convictions, for a total of 55 years to life. The abstract of judgment erroneously states that defendant was sentenced to only 25 years to life plus the five-year enhancement, and that defendant was sentenced under section 667.61. We thus direct the trial court to issue an amended abstract, although we reject defendant's request that the five-year enhancement be stricken. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.)

## III. Jury instructions

Defendant contends that the trial court erred by instructing the jury with CALJIC Nos. 3.00 and 3.02, and that the error lessened the prosecution's burden of proof and interfered with defendant's constitutional rights to a jury trial and due process.[9]

### A. CALJIC No. 3.00

The trial court read CALJIC No. 3.00, defining "principals" as follows: "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation, is equally guilty. Principals include: 1. Those who directly and actively commit the act constituting the crime, or 2. Those who aid and abet the commission of the crime."

Defendant cites *People v. McCoy* (2001) 25 Cal.4th 1111, 1117, 1122 (*McCoy*), which held that an aider and abettor may be found guilty of a different crime or degree of crime than the perpetrator if the aider and abettor and the perpetrator do not have the same mental state. For example, a less culpable mental state can be found where an innocent agent has been used to accomplish the murder. (*Id.* at pp. 1118-1121.) Based upon that holding in *McCoy*, defendant objects to the following sentence in CALJIC No. 3.00: "Each principal, regardless of the extent or manner of participation is equally guilty." He contends that the trial court should have excised the phrase "equally guilty"

---

[9] Defendant also contends that reading CALJIC No. 3.01 was error, but as he makes no argument regarding that instruction we do not discuss this contention. (See *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.)

21

from the sentence because it could lead jurors to believe that it could not find an aider and abettor guilty of a lesser degree of murder than the actual perpetrator.

CALJIC No. 3.00 is an accurate statement of the law; however a prior version of the instruction was found misleading in some exceptional circumstances in light of *McCoy*, and thus subject to modification or clarification upon request. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163-1165 (*Samaniego*).)

Respondent contends that defendant has forfeited the issue, as the "failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal. [Citations.]" (*People v. Lee* (2011) 51 Cal.4th 620, 638.) [10] In fact, the trial court provided the suggested clarification by giving the Spring 2010 revision of CALJIC No. 3.00, which modified the instruction to reflect the holding in *McCoy* and the clarification suggested in *Samaniego*. (See Use Note to CALJIC No. 3.00 (Fall 2012 Rev.); *McCoy*, *supra*, 25 Cal.4th at pp. 1117, 1122; *Samaniego*, *supra*, 172 Cal.App.4th at pp. 1163-1165.) The trial court read, in relevant part: "When the crime charged is murder, the aider and abettor's guilt is determined by the combined acts of all of the participants as well as that person's own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. Similarly, the aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state."

Defendant's authorities and argument relate only to the prior version. The 2010 clarification conforms to the holding of *McCoy* and defendant does not contend that the additional language was insufficient to clarify the "equally guilty" phrase. We conclude

---

**10**    Defendant contends that although he did not object to the instruction or request a clarification at trial, the trial court had a sua sponte duty to clarify the instruction because it contained terms that had a technical meaning peculiar to the law which the court was required to define. (See generally, *People v. Jennings* (2010) 50 Cal.4th 616, 670.) Defendant fails to explain what term required a definition and we see no terms with peculiar legal or technical meaning.

22

that defendant forfeited any further clarification not only by failing to request it but also by failing to provide current authorities and relevant argument.

### B.  CALJIC No. 3.02

Defendant contends that the trial court erroneously modified CALJIC No. 3.02, which explains the elements of the natural and probable consequences doctrine.  Under the natural and probable consequence doctrine, a defendant may be found guilty as an aider and abettor when the crime charged was not the crime the defendant intended to aid and abet, if the jury also finds that "the defendant's confederate committed an offense *other than* the target crime; and . . . the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted."  (*People v. Prettyman* (1996) 14 Cal.4th 248, 262, fn. omitted (*Prettyman*).)

First, defendant contends that the court transposed the target crime and murder in the instruction, and that the error was tantamount to a directed verdict of murder.  Defendant also contends that the jury should have been required to determine whether premeditated murder, not simply murder, was the natural and probable consequence of assault with a deadly weapon.  Both contentions lack merit.

### 1.  Transposition of target crime and murder

The trial court read CALJIC No. 3.02 to explain the natural and probable consequences doctrine, and concluded the instruction with the following modification: "In order to find the defendant guilty of the crime of murder, as charged in count 1, you must be satisfied beyond a reasonable doubt that:  (1) the crime of assault with a deadly weapon was committed; (2) that the defendant aided and abetted that crime; (3) that a co-principal in that crime committed the crime of assault with a deadly weapon; and (4) *the crime of assault with a deadly weapon was a natural and probable consequence of the commission of the crime of murder*."  (Italics added.)

It is reasonably foreseeable that assault with a deadly weapon will cause the death of the person assaulted.  (See *Prettyman*, *supra*, 14 Cal.4th at pp. 262-263.)  Obviously, the court inadvertently reversed the terms in the italicized sentence, instructing the jury to decide whether assault with a deadly weapon was a natural and probable consequence of

23

murder, rather than whether murder was a natural and probable consequence of assault with a deadly weapon. Respondent concedes the error, but contends that it was harmless. We agree with respondent.

An erroneous instruction regarding the natural and probable consequences doctrine is reviewed under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, unless there is ""'"a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citations.]" (*Prettyman*, *supra*, 14 Cal.4th at p. 272.) There was no reasonable likelihood here that the jury erroneously applied the instruction. The prosecutor thoroughly explained the theory in the correct terms. In his summation, the prosecutor argued that the jury did not have to find that defendant intended to aid and abet a murder, adding: "If he intended to aid and abet an assault with a deadly weapon, . . . a knife . . . , and you conclude that under all of the circumstances a reasonable person in his position would know that the natural and probable consequence of that knife attack is that somebody dies, that's all you need." The prosecutor then continued at length explaining the theory more thoroughly and applying the evidence to the theory.

Further, as respondent notes, the error resulted in a nonsensical theory of murder. It instructed the jury that it could find defendant guilty of murder if assault with a deadly weapon was a natural and probable consequence of murder. However, the court also instructed the jury how to determine whether one crime was the natural and probable consequence of another, and we "presume 'that jurors understand and follow the court's instructions.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) As there are many ways to commit murder without weapons, the jury would not come to the illogical conclusion that assault with a deadly weapon is a natural or probable consequence of murder. Thus the instruction most certainly did not direct a murder verdict as defendant contends. We conclude that there was no reasonable probability that defendant would have achieved a more favorable result if the court had not transposed the target crime of assault with a deadly weapon and the completed crime of murder. The error was thus harmless. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

24

## 2. Degree of murder foreseeable from assault with a deadly weapon

Defendant contends that the trial court should have instructed the jury to determine whether premeditated murder, not just any murder, was the natural and probable consequence of assault with a deadly weapon. He contends that the result was that "the jury could have used the natural and probable consequences doctrine to return a first degree murder conviction simply because it was the degree of murder the . . . perpetrator committed."

We do not review error only in the context of a single instruction, as we "must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson, supra*, 44 Cal.4th at p. 803.) The jury was instructed on murder, first degree murder, malice, deliberation and premeditation, unpremeditated second degree murder, second degree murder resulting from an unlawful act dangerous to life, the jury's duty to determine the degree of murder, giving defendant the benefit of the doubt on the degree of murder, the required unanimity on the degree of murder, and other aiding and abetting principles. There was no suggestion in the instructions that the jury was required to find defendant guilty of the same degree of murder as the actual perpetrator (if it found that he was not the actual perpetrator).

The only authority upon which defendant relies, *People v. Woods* (1992) 8 Cal.App.4th 1570 (*Woods*), does not require the particular wording defendant advocates here. There, the jury was charged with deciding whether the murder of a bystander was the natural and probable consequence of assault with a firearm, but was given instructions only as to first degree murder and not second degree murder or any other lesser offense. (See *id*. at pp. 1577-1580.) There were no such facts here, and unlike the defendant in *Woods*, the jury was given the option of finding defendant guilty of either first or second degree murder.

Regardless, there is no reasonable likelihood that the jury applied the instruction as defendant suggests, and no reasonable probability that he would have achieved a more

25

favorable result if the instruction had been worded as defendant now contends it should have been.  Overwhelming evidence established defendant's guilt of premeditated murder either as a direct perpetrator or as an aider and abettor who knew and shared the direct perpetrator's intent to kill.  Defendant admitted that he was one of the men who "shanked" Huerta; Huerta was not a bystander, he was the intended victim of the attack; the meeting of the SUV with the gold car and the telephone call suggest premeditation; and the multiple stabbings suggest premeditation and an intent to kill.  (See *People v. Pride*, *supra*, 3 Cal.4th at p. 247.)  We conclude that the trial court was not required to insert "premeditated" before murder in CALJIC No. 3.02; and that had its omission been error, it would have been harmless.  (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## DISPOSITION

The judgment is affirmed.  The superior court is directed to prepare an amended abstract of judgment reflecting the oral imposition of defendant's sentence of 50 years to life in prison, plus five years pursuant to section 667, subdivision (a)(1), for a total term of 55 years to life, and omitting reference to section 667.61.  The court is further directed to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST


26