[No. B216299. Second Dist., Div. Three. July 20, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
CORY TRAVION RUSHING et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, [[ ]].

**COUNSEL**

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant Cory Travion Rushing.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Nakia Hubbard.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Michael R. Johnsen and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KLEIN, P. J.**—Defendants and appellants, Cory Travion Rushing and Nakia Hubbard, appeal the judgments entered following their convictions for first degree murder (Hubbard) and second degree murder (Rushing), with gang enhancements (Pen. Code, §§ 187, 186.22, subd. (b)).[1] Defendants were sentenced to state prison for terms of 25 years to life (Hubbard) and 15 years to life (Rushing).

The judgments are affirmed.

### BACKGROUND

1. *Prosecution evidence.*

On the evening of October 5, 2007, Gregory Powe was driving with his 13-year-old foster son, R.R., in the car. Powe was 55 years old and, although retired, he worked part time as a school crossing guard. R.R. testified some "gang bangers" were blocking their way, so Powe got out and asked them "if they could please move." One of the gang bangers started punching Powe in the chest and the face. Powe tried to defend himself, but the beating continued. Then R.R. saw "a whole bunch of the gang bangers around" Powe,

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

who was now on the ground. Someone called the police from a nearby house. R.R. saw the paramedics arrive and treat Powe. R.R. could not identify the people who had beaten Powe.

V.S. knew defendants Rushing and Hubbard because she had grown up with them. That evening, she was about 15 feet from the intersection of 105th Street and Lou Dillon Avenue. She was standing on top of a milk crate and looking over a fence. It was " 'Hood Day" and there were 20 to 25 people in the street. V.S. had been standing on the crate for a while watching the festivities. She saw Powe get out of his car and heard him say, "Could you guys please move out of the way?" Within seconds, Hubbard and Rushing started beating Powe with their hands and feet. Hubbard kicked Powe in the head between 10 and 20 times. Powe tried to get back into his car, but Hubbard prevented his retreat. Hubbard kicked Powe in the face again. When Hubbard slammed the back of Powe's head onto the street, V.S. heard "a big pop noise."

A.G., who was 14 years old at the time of trial, testified she had been near the intersection of 105th Street and Lou Dillon Avenue that evening while walking to a friend's house. She saw "everyone arguing and then they just started fighting." Powe was being punched in the face and kicked in the face and the stomach. By the second or third time Powe got hit, he fell to the ground. His attackers continued to beat him while he was on the ground. There were two people beating Powe and a lot of other people stood around watching. A.G. testified the fight lasted less than a minute, after which she continued on to her friend's house. A.G. subsequently identified Hubbard and Rushing from photo arrays as the two men who had beaten Powe.

Powe's wife, Estella, saw him at Kaiser Hospital in Bellflower on the night of the beating. He was lying on his stomach as he received stitches to the back of his head. Powe's eyes were open, but he did not speak to her. He stayed at the hospital that night. The next day, he was not speaking, and when he was released from the hospital the day after that he was still unable to speak. Estella was concerned about his condition, but hospital personnel said he was ready to leave so she took him home to Moreno Valley. She helped him into bed and he fell asleep. About 1:45 a.m. that morning, he asked her to help him to the bathroom. When he was unable to urinate, she helped him back to bed. Powe lay down, began shaking, and then he moaned. Estella called 911. He died in the ambulance on the way to the hospital.

Dr. Mark McCormick, a forensic pathologist at the Riverside County Sheriff-Coroner's Bureau, conducted the autopsy. McCormick concluded the "cause of death was pulmonary thromboemboli due to deep-vein thrombosis, due to immobility, due to blunt impact injuries to the head." In other words:

"The combination of the [head] trauma and his immobility [first at the hospital and then at home] led him to form clots around [a filter in his] inferior vena cava . . . . Subsequently, those clots broke loose . . . ." These formed pulmonary thromboemboli, which caused Powe's death.

Powe had suffered a prior incident of blood clot formation in 1994, when a burn injury immobilized him for a sustained period. At that time, he was treated with the blood thinner Coumadin and a filter was inserted into his inferior vena cava. According to McCormick, the inferior vena cava is "the large vessel that returns blood from the lower part of the body . . . back to the heart and also to the lungs." The filter was intended to catch blood clots that formed in Powe's legs before they could travel to his heart. McCormick explained that Powe's earlier burn injury, like the head trauma he sustained in the beating, released factors into the blood which lowered his threshold for clot formation.[2]

McCormick opined that treating Powe at the hospital with Coumadin to thin his blood would not have been a good idea because there was evidence of internal head bleeding. Although the hospital doctors could have properly recommended semimobility as a prophylaxis against the formation of blood clots, given the presence of the vena cava filter it would have been proper to recommend "bed rest over mobility." Asked if "it would have been below the medical standard of care to release Mr. Powe the way they did without any follow-up instructions or care," McCormick testified, "No, I don't believe so." McCormick opined that keeping Powe in the hospital for another day or two "would [not] have changed anything."

Los Angeles Police Officer Samuel Marullo testified as a gang expert. He was familiar with the Fudge Town Mafia Crips gang, which had 76 documented members, about 40 of whom were active. The gang's members were predominantly African-American. The gang's primary activities included drug trafficking, robbery, weapons crimes, assault and murder. October 5 was considered 'Hood Day for the Fudge Town Mafia Crips gang: "All gangs have 'Hood Days where they celebrate being gang members of a particular neighborhood. Usually . . . that day is selected based on the street that they

---

[2] McCormick testified the autopsy revealed the following: "[I]n the pulmonary arteries, which are the vessels that go from the heart out to the lungs, there were pulmonary thromboemboli, or formed clots, blocking both those passages on the right and the left. So there were blood clots blocking the flow of blood from the heart to both lungs." There was another formed blood clot wrapped around the filter in Powe's inferior vena cava. All the clots appeared to have been recent, but they did not form at the trauma sites. According to McCormick, the only source for the pulmonary clots was the clot that had formed in the inferior vena cava.

affiliate themselves with. In this case it's 105th Street." 'Hood Day was a celebration of gang membership and it typically entailed the commission of violent acts.

The Fudge Town Mafia Crips make their money by selling drugs and committing robberies. Because their revenue is primarily earned by committing crimes against the people who live within their own territory, the gang tried to foster community respect based on fear because fearful victims will not cooperate with the police. If a Fudge Town member committed murder, his status would rise and it would make no difference whether the victim was a rival gang member or an ordinary citizen. In Marullo's opinion, both defendants were members of Fudge Town.

Given a hypothetical based on the facts of this case, Marullo testified Powe's assault had been committed for the benefit of the Fudge Town Mafia Crips. Because the gang's members truly believed the neighborhood belonged to them, having someone ask them to move out of the way on 'Hood Day would have been viewed as extremely disrespectful.

 2. *Defense evidence.*

Los Angeles Police Detective Mark Hahn was one of the two investigating officers. He testified A.G. said she had been on her friend's porch, three houses away from the intersection, when she saw people starting to fight. Hahn was unclear if A.G. meant she had been on that porch during the entire incident, but she did not say she had been walking through the crime scene as the incident occurred.

A defense investigator testified he went to the scene and measured the distance from where V.S. testified she had witnessed the incident to the northwest corner of Lou Dillon Avenue. The investigator testified that distance was 85.4 feet, and the fence V.S. had been standing behind was seven and one-half feet high.

Donnavette Raby testified she knew Hubbard from having grown up in the neighborhood, although she no longer lived there. She was good friends with Hubbard's sister. Raby's grandfather lived near the 105th Street/Lou Dillon Avenue intersection. That day, Raby was visiting her grandfather just after dark. There were 50 or more people out on the street. She parked near Hubbard's car and went to her grandfather's house. Her grandfather's wife introduced Raby to Powe, saying he was a fellow church member. Raby went outside and spoke to Hubbard and his sister. Traffic on 105th Street was backed up in both directions. She heard noise from the corner but could not see anything because of the crowd and the traffic congestion. Hubbard said to

her, "Them niggers probably down there doing something they don't have no business doing. I'm out of here." He got into his car and left.

Raby then heard a woman screaming, so she walked to the intersection to see what was going on. The crowd was scattering and Raby saw Powe "hit the ground." Raby ran back to her grandfather's house to tell them to call the police. She did not recognize anyone in the crowd. Raby spoke to the police that night and told them what she told the jury. She acknowledged having lied to Detective Hahn when she said she did not know Hubbard's real name, but that was because she did not think it was relevant since Hubbard had had nothing to do with assaulting Powe. Raby acknowledged the father of her child was serving a life prison term in connection with his membership in the Fudge Town Mafia Crips.

### 3. *Rebuttal evidence.*

Detective Hahn testified he measured the distance from the point at which V.S. had been viewing the events to the eastern curb of Lou Dillon Avenue at 105th Street. It was 43 feet, although this measurement did not include the distance across Lou Dillon Avenue to where the incident occurred. Hahn testified the fence was six and one-half feet tall.

## CONTENTIONS

1. There was *Batson/Wheeler* error.

2. The trial court erred by admitting certain gang evidence.

3. There was insufficient evidence to sustain Hubbard's conviction for first degree murder.

4. There was insufficient evidence to sustain the gang enhancements.

5. The trial court erred by refusing to give a modified version of CALCRIM No. 620.

6. There was prosecutorial misconduct.

7. There was cumulative error.

## DISCUSSION

1. *Defendants did not make out a prima facie case of* Batson/Wheeler *error.*

Defendants contend the trial court erred when it ruled the defense failed to make out a prima facie case of discrimination based on the prosecutor's peremptory challenge of a single African-American prospective juror. This claim is meritless.

### a. *Legal principles.*

██ Under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], and *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], "[a] party may not use peremptory challenges to remove prospective jurors solely on the basis of group bias. Group bias is a presumption that jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds." (*People v. Fuentes* (1991) 54 Cal.3d 707, 713 [286 Cal.Rptr. 792, 818 P.2d 75].)

"The United States Supreme Court recently reiterated the applicable legal standards. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the [apparently discriminatory] exclusion" by offering permissible . . . justifications for the strikes. [Citations.] Third, "[i]f a [nondiscriminatory] explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful . . . discrimination." ' [Citations.] [¶] In order to make a prima facie showing, 'a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class.' [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 186 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

The analysis begins with the presumption a party exercising a peremptory challenge is doing so on a constitutionally permissible ground. (*People v. Wheeler, supra,* 22 Cal.3d at p. 278.) "[T]he law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative. [¶] For example, a prosecutor may fear bias . . . because [a juror's] clothes or hair length suggest an unconventional life-style." (*Id.* at p. 275.)

A trial court's ruling on a *Wheeler* motion is reviewed for substantial evidence. (*People v. Alvarez* (1996) 14 Cal.4th 155, 196 [58 Cal.Rptr.2d 385, 926 P.2d 365].) "The determination of whether a defendant has established a prima facie case 'is largely within the province of the trial court whose decision is subject only to limited review. [Citations.]' [Citation.] On appeal, we examine the entire record of voir dire for evidence to support the trial court's ruling. [Citation.] Because of the trial judge's knowledge of local conditions and local prosecutors, powers of observation, understanding of trial techniques, and judicial experience, we must give 'considerable deference' to the determination that appellant failed to establish a prima facie case of improper exclusion. [Citation.]" (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 782 [7 Cal.Rptr.2d 152].) "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm." (*People v. Howard* (1992) 1 Cal.4th 1132, 1155 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

 b. *Background.*

Prospective Juror No. 9144 (hereafter, Juror 4) was part of the initial panel of 20 prospective jurors. She told the trial court she was a stay-at-home mother married to a mail carrier. They lived in Downey, where she home-schooled their two children. She had never been the victim of, or a witness to, any crime and she did not have any prior jury experience.

Question No. 7 on the written juror questionnaire asked: "A party, witness, or attorney may come from a particular national, racial, or religious group or may have a lifestyle different from your own. Would that fact in any way affect your ability to be a fair and impartial juror?"[3] Juror 4 told the trial court she had answered affirmatively to "part" of that question. Asked to elaborate, she said, "I think the religious part" because, "depending on the person's view" of "religion or God, it affects their whole outlook on everything." Asked if that was "going to be an issue for you as a juror?," Juror 4 replied, "Maybe." When the court asked her to explain, she said, "[I]f somebody doesn't believe in God then I think just their whole outlook on everything [*sic*]." When the trial court asked "how does that affect how you would view them as a juror?," she said, "I don't know. I'm not exactly sure. I guess it would just depend." She concurred with the court's assessment that she "disagree[d] with some religions." Juror 4 also said she did not believe her views would prevent her from being a fair juror, and that she understood this was not a religious court.

---

[3] The written juror questionnaire has not been made part of the record on appeal, but the defendants do not dispute the accuracy of the Attorney General's characterization of question No. 7.

None of the other prospective jurors in the initial 20-person venire responded affirmatively to question No. 7 of the written questionnaire.

Hubbard's attorney asked Juror 4 why she thought people became gang members, and she replied, "Different reasons. I know a lot because background [sic], they had nowhere else to turn to."

After the prosecutor used a peremptory challenge, the defendants jointly used a peremptory challenge against a second prospective juror. The prosecutor then used a peremptory challenge against Juror 4 and Hubbard's counsel made a *Wheeler* motion. The following colloquy occurred:

"[Hubbard's counsel]: Yes, Judge. Three African-Americans on the panel out of the entire 20. I mean, totally unrepresented. This case involves African-American on Hispanic and almost the entire rest of the panel is Hispanic.

"[Rushing's counsel]: African-American on?

"[Hubbard's counsel]: I'm sorry. The witnesses are all Hispanic. The witnesses against the defendant are all Hispanic.

"The Court: But the victim is African-American.

"[Hubbard's counsel]: That's true.[4] My client obviously is African-American. So when the panel is under-represented, I think counsel should give us a plausible reason why he would use a peremptory against one-third of all the African-Americans of the 20.

"The Court: Okay.

"[Rushing's counsel]: Submitted.

"The Court: Okay. I don't find that's a prima facie case [defense counsel] has made. And having said that, if you want to state your reason for the record, you may.

"[The prosecutor]: . . . No, thank you."

After the defendants used another peremptory challenge, the trial court continued with the voir dire of a new group of prospective jurors, none of

---

[4] Despite this clarification, Hubbard makes the same mistake on appeal, asserting in his reply brief that Powe was Hispanic.

whom had responded affirmatively to question No. 7. Neither of the two subsequently chosen alternate jurors had answered question No. 7 affirmatively.

The record does not reflect whether the jury that ultimately heard defendants' case included any African-Americans.

### c. *Discussion.*

Hubbard argues Juror 4 "was a person with no recognizable biases" and that a comparative analysis with the other prospective jurors who went unchallenged reveals there was impermissible discrimination.

However, our Supreme Court has said: "As we have explained, '[w]hatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his [or her] strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales . . . .' [Citation.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 617 [108 Cal.Rptr.3d 87, 229 P.3d 12].)

■ Moreover, the record suggests several race-neutral reasons for challenging Juror 4.

Juror 4 expressed some degree of sympathy for gang members when she said she believed people joined gangs because they had nowhere else to turn. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 191 [66 Cal.Rptr.2d 123, 940 P.2d 710] [that prospective juror might be sympathetic to defendant because of his high school familiarity with Blood gang members warranted peremptory challenge].)

■ Juror 4's husband worked for the post office. Occupation can be a permissible, nondiscriminatory reason for exercising a peremptory challenge. (See *People v. Trevino* (1997) 55 Cal.App.4th 396, 411 [64 Cal.Rptr.2d 61] ["it could be hypothesized the People were exercising their challenges based on a belief those members who had some connection with providing [health] care or social services would not be sympathetic to their case"]; *People v. Landry* (1996) 49 Cal.App.4th 785, 790–791 [56 Cal.Rptr.2d 824] [race-neutral factors included job in youth services agency and background in psychiatry or psychology]; *People v. Perez* (1996) 48 Cal.App.4th 1310, 1315 [56 Cal.Rptr.2d 299] [no prima facie case where challenged members shared characteristic of being single and working in "social services or caregiving fields"]; *People v. Barber* (1988) 200 Cal.App.3d 378, 394 [245 Cal.Rptr. 895] [proper to challenge kindergarten teacher based on belief teachers are generally liberal and less prosecution oriented].) The occupation of a prospective

juror's spouse may be a legitimate nondiscriminatory reason for a peremptory challenge. (See *People v. Trevino, supra*, 55 Cal.App.4th at p. 411 ["each of the [jurors] challenged had a connection [either directly or through a spouse] with an organization that provided health care"].) Courts which have directly addressed the issue of exercising peremptory challenges against postal workers have viewed this as a race-neutral reason.[5]

And, contrary to Hubbard's assertion that Juror 4 was unbiased, she acknowledged a religious prejudice against atheists which might have prevented her from being a fair juror. (Cf. *People v. Mills* (2010) 48 Cal.4th 158, 184 [106 Cal.Rptr.3d 153, 226 P.3d 276] [prospective juror who "believed Satan controls this world and the people in it" was properly challenged for "strident . . . religious views"]; *People v. Martin* (1998) 64 Cal.App.4th 378, 384 [75 Cal.Rptr.2d 147] [prosecutor properly challenged Jehovah's Witness whose voir dire answers indicated her "religious views might render her uncomfortable with sitting in judgment of a fellow human being"].) Hubbard argues this bias would not matter because "religious beliefs were not an issue in the case nor would the religious beliefs of any of the witnesses or defendants ever become part of the trial." We disagree. The prosecutor could have been legitimately concerned Juror 4 might discover or assume that any one of the trial participants (e.g., witnesses, attorneys, etc.) was a nonbeliever and, accordingly, view that person in a negative light.

■ Hubbard argues Juror 4's "responses to further inquiry showed that she would not allow her [religious] beliefs to affect her service." But the prosecution is not required to accept at face value a prospective juror's assurance that, despite an answer indicating the contrary, she would have no problem being neutral. In such cases, the juror's apparent uncertainty is a legitimate reason for exercising a peremptory challenge. (See *People v. Taylor, supra*, 48 Cal.4th 574, 643, fn. 19 [prosecutor legitimately could have believed prospective juror who worked as nurse would be inclined to credit defense mental health experts, despite her questionnaire statement to the contrary]; *People v. Young* (2005) 34 Cal.4th 1149, 1174 [24 Cal.Rptr.3d 112, 105 P.3d 487] [even though prospective juror who worked as therapist "gave assurances she harbored no biases or opinions that would affect her ability to be open-minded and fair, the prosecutor might have reasonably exercised a challenge to excuse [her] on this basis" because there might be evidence of "extreme mental disturbance" at penalty phase].)

---

[5] See, e.g., *Williams v. Groose* (8th Cir. 1996) 77 F.3d 259, 261 ("The prosecutor explained he removed jurors Lacy and Tillman because they are postal workers. This reason is race neutral."); *Johnson v. State* (1996) 266 Ga. 775 [470 S.E.2d 637, 639] (that prospective juror "was a postal worker, and postal workers, in the prosecutor's experience, do not make good jurors" was legitimate neutral reason); *State v. Hinkle* (Mo.Ct.App. 1999) 987 S.W.2d 11, 13 (that "postal workers are historically bad jurors for the state" was legitimate neutral reason).

In sum, the "record 'suggests grounds upon which the prosecutor might reasonably have challenged" Juror 4 (*People v. Howard, supra,* 1 Cal.4th at p. 1155) because there was evidence "suggestive of juror partiality" (*People v. Wheeler, supra,* 22 Cal.3d at p. 275). Hence, there was substantial evidence to support the trial courts' ruling that defendants failed to make out a prima facie case of *Batson/Wheeler* error. (See *People v. Alvarez, supra,* 14 Cal.4th at p. 196.)

[[]]*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## DISPOSITION

The judgments are affirmed.

Croskey, J., and Kitching, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 2, 2011, S195816.

---

*See footnote, *ante,* page 801.