Filed 8/25/14  P. v. Frances CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B249476 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA405929) |
| v. | |
| ROBERT JONATHAN FRANCIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara R. Johnson, Judge.  Reversed.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**INTRODUCTION**

After hearing the prosecutor's explanation for why she exercised a peremptory challenge on one of the four African-American prospective jurors she challenged, the trial court stated that the only reason the court could see that the prosecutor exercised the challenge was "the fact that he was a Black man." After initially indicating it would grant the defendant's motion pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Batson/Wheeler* motion) challenging the prosecutor's use of peremptory challenges to remove African-American prospective jurors on the basis of race, the trial court denied the motion. We reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

On the afternoon of July 18, 2012 defendant Robert Jonathan Francis, who is African-American, was riding a bus in Los Angeles when he grabbed a necklace worn by a fellow passenger. The passenger fought to keep her necklace, but Francis broke free and got off the bus, taking the necklace with him. Once outside, Francis realized that he left his shopping bag on the bus. The victim, who had grabbed Francis' bag during the struggle, walked to the front of the bus, spoke to Francis through the open door, and told him that she would give him his shopping bag if he returned her necklace. Francis got back on the bus, kicked the victim in the leg, and then fled, leaving his bag behind. A surveillance camera on the bus recorded the entire incident. The victim gave Francis' bag to the police. Inside was some chicken and a jacket with the name "Francis" written on the label.

The People charged Francis with robbery. During jury selection the prosecutor, Trudi White-Black, who also is African-American, used her first, third, fourth, and sixth peremptory challenges to excuse Prospective Juror Nos. 2, 4, 16, and 21, four of the five African-American prospective jurors in the 35-person venire. After the prosecutor's sixth

2

peremptory challenge, counsel for Francis, Richard Ewell, asked to approach, and the following exchange occurred at side bar:

"Mr. Ewell: Your Honor, at this time, I want to bring a *Batson/Wheeler* motion. The prosecutor has kicked off Juror No. 2, who is a male Black; Juror No. 4, who is a female Black; Juror No. 16, female Black; and Juror No. 21, female Black. I feel she's being racially prejudiced against Black jurors who — maybe she feels that they are more sympathetic to my client.

"The Court: All right. I think that you have established a reason for the People to respond. Well, it's a little late for the earlier ones but certainly for the last one. So, People, as to [No.] 21.

"Ms. White-Black: Juror No. 16 was an attorney, and I immediately marked her off because — as soon as she sat down. So she was a goner just by virtue of the fact that she was an attorney.

"Juror No. 2, the Black male that was seated [in] seat two originally, when the court made inquiry of him, he was slow to respond and seemed to not be as quick to grasp the concepts as some of the other jurors, in my opinion. I also noted when court called a break, when he was walking out of the courtroom, that he had his pants hanging low and they were sagging. When I saw that, that pretty much sealed his fate as far as I was concerned. . . .

"Juror No. 4 . . . was also slow to respond and not as quick to understand some of the concepts. She appeared to me to be hesitant in answering many of the questions. I don't know if she just felt nervous or felt that she didn't want to say anything because she didn't want to get it wrong, but for — those are the reasons that I kicked her.

"And Juror No. 21 — yes, Juror No. 21, the registered nurse that I just kicked, um, the last hypothetical that I gave her where she factored in this whole idea that the roommate was probably nervous and didn't get a good look, again, I think it illustrated her inability to process circumstantial evidence. And that's not the type of juror that I want on my case. So those are the reasons that I kicked that last juror.

3

"The Court:  Okay.  Juror No. 2, the Black male that was first excused, gave correct answers.  His attitude was correct.  He was a young man which I was very impressed in terms of serving jury duty on.

"This last . . . Juror No. 21, also gave direct answers.  And I don't know if she understood what your questions were, but I think that they were certainly reasonable in her explanation of them in terms of circumstantial evidence.  She knew the law.  She applied it correctly.  She gave extra facts.  Haven't been anymore than any of these other defendants [*sic*] have been.

"I can see why you might excuse the attorney, but one, two, three, four Black people plus an Asian male, which the defense doesn't bring up, No. 13 — so of all of your six peremptories, five of them have been from racial minorities, so to speak.  And, for the record, although the court can see, you are a Black attorney, the prosecutor.  The defendant is a Black defendant.

"I think that the defense may have a valid concern with knocking off all the people, although the defense has knocked off also two Asian males, both of them I can see why he would in terms of those people.

"So hold on a second.  And so I'm just trying to get the correct language here.  I think that the justification has not been sustained.  I think that the defense has shown a prima facie case.  We can either reseat No. 21 or declare a mistrial and start over.

"Ms. White-Black:  Your Honor, if I could just respond.  I think a *Wheeler/Batson* requires only that there be some nonracially-motivated reason for kicking the jurors.  These peremptories that were made by the People were not based on race.  Each juror —

"The Court:  There [is] only one other Black person still on the jury, none in the audience remaining.

"Ms. White-Black:  I understand that.  And there's nothing in *Wheeler/Batson* that says the racial makeup of the jury has to have any specific number of  — of any racial or protected class.  It only requires that the motivation for excusing a juror not be racially motivated or be motivated by some protected class.  I did not make any peremptories based on race.  I made peremptory challenges based on nonrace-based reasons.  And

4

merely because the court or defense counsel has a different opinion about my reasons or they may not have used — kicked those jurors, again, that's not the standard.

"The Court:  I'm not questioning your — I am questioning your basis.  But it appears to me — I have to also evaluate the reasons why you're excusing these jurors. And in my evaluation of the jurors that have been excused, all but one of them, the attorney — and it's not because she's an attorney, just because her answers are elaborate and not really — she did worse that a regular non-attorney juror.  And it seems to me that except for her, there was not really any great reason.

"A person — how a person dresses or sags — and I didn't notice that about Juror No. 2.  I looked at him and thought he was a working man, looked appropriate for court, didn't have any biases against police officers, had been stopped a lot by police officers or anything like that.

"So it's not just you.  It's how it appears and the appearance of it.  And it appears to me that that is the reason.  So we can either reseat [Prospective Juror No. 21] or declare a mistrial.  I'm finding that there is —

"Ms. White-Black:  It's not a mistrial.  It's a new venire.  We just get a new venire.

"The Court:  We can do that.  It's not just you.  It's what the court views at *Batson/Wheel*er.  How it looks, and that's what it appears.

"Ms. White-Black:  Well, Your Honor, my . . . reasons for kicking these jurors are not racially motivated, and they're not motivated by any other protected class.  The mere fact that they happened to be black, again, it's not the standard.  The appearance of the standard — the appearance of motivation just looking at the color of the skin, I believe is the incorrect analysis under *Wheeler/Batson*.  The correct analysis under a *Wheeler/Batson* [motion] is whether the motivation for exercising the peremptory was based on race, not simply because they happen to be of the same race.

"The Court:  Right.  This is what I'm supposed to do.  My understanding is — and I'm reading directly — I must make a sincere and reasonable attempt to understand why these people and evaluate an explanation.

5

"In light of the explanation that you're giving me and in light of the circumstances of this case and in light of the manner in which you were asserting these peremptories, the first one, two, three, four — four, not No. 20 — I can't recall what No. 20 is.

"Mr. Ewell:  She's a female Hispanic.

"Ms. White-Black:  She was also.  Juror No. 21 and [No.] 20 are in the same boat. They both had responses to the questions that illustrated to me that they did not grasp the concept.  Juror No. 21 was talking about — I'm sorry.  Juror No. 20 was talking about beyond a shadow of a doubt; and, similarly, Juror No. 21, when I presented her with the hypothetical with circumstantial evidence, she factored into all these things that weren't even in the hypothetical.  She couldn't make a reasonable inference.  She didn't seem to even understand what reasonable inference was.

"The Court:  I disagree.  And I rarely grant for cause unless there is cause.  And peremptories, I rarely even have this discussion with attorneys.  But it seems to me, looking at the whole panel, looking at the first six peremptories which were all — even that is not so unusual in L.A. because most of the remaining panel are either Hispanic or Asian, but it seems to me with the panel that we have — I think it's 35 — and, one, looking at the audience now, only one Black female remains in the — that's already in the first 18 and none in the audience.  And —

"Ms. White-Black:  Your honor, again, I – I don't believe that —

"The Court:  I don't have to give an explanation.  You've given your explanation. I'm giving you an explanation of why I think that I have to sustain his *Wheeler* motion."

The exchange between the trial court and the prosecutor continued, after which counsel for Francis asked the court to call for a new panel of jurors.  Because it was lunch time, the trial court stated, "We can continue to argue.  I'm going to excuse this panel and ask them to come back and order a new one, just in case, after I've reviewed the statements, the voir dire, with the reporter.

After the lunch recess, the discussion regarding Francis' *Batson/Wheeler* motion resumed.  The court recapped that it had found "a prima facie case for having the People explain . . . their excusing of four challenged jurors who were Black jurors, and the

6

People made their reasons for excusing them." The court further explained that over the lunch hour it "had the opportunity . . . to go back over the discussions with the court reporter [as] to what was said. And, apparently, in its research, one of the reasons for excusing Juror No. 2 was because of his dress and attire. There is a case that says dress and attire can be a reason for peremptory challenges. I read over his statements. His statements were not out of the ordinary. . . ."

Ultimately the trial court ruled: "All right. The rule is that unless a discriminatory intent is inherent in the People's explanation for exercising a peremptory challenge, the explanation will be deemed race neutral. That's according to *Hernandez v. New York* [(1991)] 500 U.S. 352 [111 S.Ct. 1859, 114 L.Ed.2d 395]. But in the California case, *People v. Silva* [(2001)] 25 Cal.4th 345, if the reason for excusing a juror is plausible, the court may accept the reasons and not require to question the prosecutor to make a detailed finding. I think that this — and this is only after going back and reading the transcript and particular questions and particular answers and the prosecutor's particular responses to my ruling after the prima facie had been shown, only then have I come to the conclusion that, while it's close, that the motion for . . . *Batson/Wheeler* should be denied at this time. Again, I think that it's a fine line, but I think that the case law that says where it's plausible, where there are not inherent excusal — peremptory excusals, then it should not be granted. And so, usually, again we start early on. We're at the last of the one that's been excluded. And so we will proceed from there with a caution to the People that I'm looking more inherently at this jury process."

After the court denied the *Batson/Wheeler* motion, the prosecutor belatedly stated that she had also challenged Prospective Juror No. 4 because she was a postal worker. She explained, "I hardly ever keep postal workers on my jury. In fact, as soon as Juror No. 4 said, 'I'm a postal worker,' I put an X on that juror's sticky as I did Juror No. 6." The prosecutor further stated that she decided to challenge the remaining African-

7

American prospective juror on the panel, No. 6, "the moment she said postal worker."[1] During the ensuing discussion, the trial court returned its attention to Prospective Juror No. 2, stating he "was not a postal worker. His pants weren't sagging. He was a young Black man who answered correctly, and your reason for kicking him is because his pants were sagging. And that is where we get to sham and reality. That's where the court has to decide." The court stated, "I can't understand why you kicked No. 2. There is nothing that he said, nothing that he did, no way that he dressed except the fact that he was a Black man that he was kicked."

Following the completion of jury selection, the clerk swore in the panel and the evidentiary portion of the trial commenced. The jury convicted Francis of first degree robbery (Pen. Code, § 211). The trial court sentenced him to state prison for 16 months, one-third of the middle term of four years, to be served consecutively to a previously imposed five-year-term for an unrelated robbery conviction.

## DISCUSSION

A. *The Applicable Law and Standard of Review*

A criminal defendant is deprived of his federal constitutional right to equal protection (*Batson v. Kentucky*, *supra*, 476 U.S. at pp. 84-89) and his state constitutional right to be tried by a jury drawn from a representative cross-section of the community (*People v. Wheeler*, *supra*, 22 Cal.3d at pp. 276-277) when a prosecutor exercises a peremptory challenge to remove a prospective juror on the impermissible basis of race or ethnicity. (*People v. Williams* (2013) 58 Cal.4th 197, 280; see *People v. Silva* (2001) 25 Cal.4th 345, 386.) As the California Supreme Court recently observed, "[t]he three-stage procedure that applies to *Batson/Wheeler* motions is familiar. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise

---

[1] Ultimately, the prosecutor did not use a peremptory challenge to ask the court to excuse Prospective Juror No. 6 from the jury.

to an inference of discriminatory purpose." [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.[2] [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discretion."'" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 469, quoting *Johnson v. California* (2005) 545 U.S. 162, 168 [125 S.Ct. 2410, 162 L.Ed.2d 129]; see *People v. Montes* (2014) 58 Cal.4th 809, 847.)

This case involves the third stage of the *Batson/Wheeler* analysis.  At this stage, "'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" (*People v. Lenix* (2008) 44 Cal.4th 602, 613, quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 339 [123 S.Ct. 1029, 154 L.Ed.2d 931].)  "'The proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons.' [Citation.]  "'[E]ven a 'trivial' reason, if genuine and neutral, will suffice."'. . .'" (*People v. Jones* (2013) 57 Cal.4th 899, 917, quoting *Lenix*, *supra*, at p. 613.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions.  [Citation.]  'We review a trial court's determination regarding the sufficiency of a prosecutor's

---

[2]     At the second stage, "'[a] prosecutor asked to explain his conduct must provide a "'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." [Citation.]  "The justification need not support a challenge for *cause*, and even a 'trivial' reason, if genuine and neutral, will suffice." [Citation.]  A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.' [Citation.]  '[B]ut race-based decisions are not constitutionally tolerable.' [Citations.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 102.)

justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*People v. Lenix*, *supra*, 44 Cal.4th at pp. 613-614, fn. omitted; see *Hernandez v. New York*, *supra*, 500 U.S. at pp. 364-365; *People v. Montes*, *supra*, 58 Cal.4th at p. 847; *People v. Williams*, *supra*, 58 Cal.4th at p. 281; *People v. Silva*, *supra*, 25 Cal.4th at pp. 385-386.) Deference does not, however, preclude relief. (*Miller-El v. Dretke* (2005) 545 U.S. 231, 240 [125 S.Ct. 2317, 162 L.Ed.2d 196]; *Lenix*, *supra*, at p. 616.)

B.    *The Peremptory Challenges*

On appeal Francis "admits that the prosecutor had a legitimate reason for striking Juror 16." Francis challenges only the prosecutor's use of peremptory challenges to ask the court to excuse Prospective Juror Nos. 2, 4, and 21.

Prospective Juror No. 2 lived in South Central Los Angeles. He worked as an underground utility locator. He was single, had no children, and had no prior jury experience. The prosecutor exercised a peremptory challenge and asked the court to excuse him because, in her opinion, "he was slow to respond and seemed to not be as quick to grasp the concepts as some of the other jurors," and because of the way he dressed. When the trial court called a recess, the prosecutor observed that Prospective Juror No. 2's "pants [were] hanging low and they were sagging," which for the prosecutor "pretty much sealed his fate . . . ."

The trial court saw Prospective Juror No. 2, and his pants, differently. The court noted that Prospective Juror No. 2 "gave correct answers" and that it "was very impressed" with him. With regard to the prosecutor's concerns about Prospective Juror No. 2's "sagging" pants, the court stated that it had "looked at him" and that he "looked appropriate for court." When counsel for Francis later noted that he "didn't observe

10

[Prospective Juror No. 2] being dressed out of the ordinary" and that he did not observe his pants to be "low," the trial court said, "Neither did I." The court stated that not only had Francis "shown a prima facie case," the prosecutor's "justification has not been sustained."

Despite the trial court's expressed concerns about the constitutional propriety of the prosecutor's decision to challenge Prospective Juror No. 2 and the court's initial inclination to grant Francis' *Batson/Wheeler* motion, the court later changed its mind after finding case law holding that a person's manner of dress is a legitimate basis for a peremptory challenge.**3** Significantly, however, the trial court never changed or withdrew any of its factual findings. To the contrary, even after denying Francis' *Batson/Wheeler* motion, the trial court repeated its findings and stated its belief that the prosecutor's peremptory challenges were based on race. The court stated that Prospective Juror No. 2's "pants weren't sagging. He was a young Black man who answered correctly, and your reason for kicking him is because his pants were sagging. And that is where we get to sham and reality. That's where the court has to decide." The court concluded, "I can't understand why you kicked No. 2. There is nothing that he said, nothing that he did, no way that he dressed except the fact that he was a Black man that he was kicked." The

---

**3** The trial court correctly determined that dress and attire can be a race-neutral basis for exercising a peremptory challenge. "'[T]he law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative. [¶] For example, a prosecutor may fear bias . . . because [a juror's] clothes or hair length suggest an unconventional life-style.' [Citation.]" (*People v. Rushing* (2011) 197 Cal.App.4th 801, 808, quoting *People v. Wheeler*, *supra*, 22 Cal.3d at p. 275; see *People v. Cruz* (2008) 44 Cal.4th 636, 658 [prosecutor properly challenged young prospective juror who "had come to court in a long, unbuttoned flannel shirt, thereafter arrived at the peremptory challenge hearing in a plain white T-shirt, and appeared to be one of the 'most poorly dressed' individuals in the courtroom"]; *People v. Ward* (2005) 36 Cal.4th 186, 202 ["the trial court's implied finding that the prosecutor's stated reasons were sincere and genuine is entitled to great deference where, as here, the reasons are based on the prospective juror's appearance and demeanor"].)

11

only reasonable construction of this statement is that the trial court believed that the prosecutor's stated reasons for challenging Prospective Juror No. 2, though facially race-neutral, were not credible or subjectively genuine. (See *People v. Jones*, *supra*, 57 Cal.4th at p. 917; *People v. Lenix*, *supra*, 44 Cal.4th at p. 613.)

Although some of the trial court's statements suggest that the court understood its obligations under *Batson/Wheeler*, the court did not conduct the third stage of the analysis properly. In light of the trial court's finding that Prospective Juror No. 2 was "kicked" because "he was a Black man," the trial court erred by denying Francis' *Batson/Wheeler* motion with respect to this particular prospective juror. (See *People v. Silva*, *supra*, 25 Cal.4th at p. 386 ["[t]he exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal"].) Francis is entitled to a new trial.

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.

ZELON. J.

---

[*] Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.