Filed 2/27/25; Certified for Publication 3/20/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CORY T. RUSHING,<br><br>    Defendant and Appellant. | B334988<br><br>(Los Angeles County<br>Super. Ct. No. TA097346) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Cory T. Rushing appeals the summary denial of his petition for resentencing under Penal Code section 1172.6.[1] We affirm the denial because the trial court never instructed the jury with either of the two instructions on the natural and probable consequences doctrine, even though it read the optional bracketed language in CALCRIM No. 400 that introduced the theory of liability for a crime that was committed while a person was aiding and abetting another crime.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Facts[2]

On the evening of October 5, 2007, Gregory Powe was driving with his 13-year-old foster son, R.R.  Twenty to 25 gang members were celebrating the Hood Day of the Fudge Town Mafia Crips in the intersection of 105th Street and Lou Dillon Avenue in Los Angeles.  They blocked the way for Powe to drive.  Powe got out of the car and asked them to move.  Rushing and his fellow gang member Nakia Hubbard started beating Powe with their hands and feet.  Powe tried to get back inside his car, but Hubbard stopped him.  Hubbard kicked Powe in the face and

---

[1]    All further statutory references are to the Penal Code. Effective June 30, 2022, section 1170.95 was renumbered section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)

[2]    We refer to the factual background from the Court of Appeal opinion in *People v. Rushing* (2011) 197 Cal.App.4th 801 (*Rushing*), which affirmed the judgment of conviction.  These facts are "for background purposes and to provide context for the parties' arguments."  (*People v. Flores* (2022) 76 Cal.App.5th 974, 978, fn. 2.)  We do not rely on these facts to review the trial court's determination for Rushing's prima facie showing.  (*Id*. at p. 988.)

2

slammed the back of his head onto the street, causing a "big pop" sound.

Two eyewitnesses identified Rushing and Hubbard as the perpetrators who attacked Powe. One of the witnesses had grown up with Rushing and Hubbard.

The paramedics arrived and transported Powe to the hospital. Powe was discharged after one night in the hospital. After Powe returned home, he began shaking while in bed. His wife called 911. Powe died in the ambulance on the way to the hospital.

The autopsy revealed that the combination of head trauma and immobility at the hospital and at home led to the formation of clots around the inferior vena cava which returns blood from the lower part of the body, back to the heart and lungs. The clots broke loose and formed pulmonary thromboemboli which caused Powe's death.

Los Angeles Police Officer Samuel Marullo testified as a gang expert. He stated that October 5 was the Hood Day for the Fudge Town Mafia Crips gang. All gangs have a Hood Day to celebrate their membership. The day is typically selected based on the street affiliated with the gang. In the case of the Fudge Town Mafia Crips, 105th Street is that street. According to Marullo, Hubbard and Rushing were members of the Fudge Town Mafia Crips.

## II. Procedure

### A. Trial

On April 29, 2009, a jury convicted Hubbard of first degree murder and Rushing of second degree murder (§ 187, subd. (a)) and found the gang enhancement (§ 186.22, subd. (b)) true for

both.  On May 8, 2009, the trial court sentenced Rushing to 15 years to life.

Rushing appealed and a panel of this court affirmed the judgment in a partially published opinion.  (*Rushing*, *supra*, 197 Cal.App.4th at 803, 813.)

### B.    *Section 1172.6 Proceedings*

On June 27, 2022, Rushing filed a form petition for resentencing under section 1172.6.  The court appointed counsel to represent him.  On October 13, 2023, the court conducted a prima facie hearing and denied Rushing's petition.

## DISCUSSION

## I.    Changes to Murder Law

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (SB 1437) amended the substantive law on accomplice liability for murder by significantly narrowing the felony murder rule[3] and by requiring that a principal in a crime act with malice aforethought.  (§§ 189, subd. (e), 188, subd. (a)(3); *People v. Curiel* (2023) 15 Cal.5th 433, 448–449 (*Curiel*).)  Pertinent for our review, the latter change requires that malice "not be imputed to a person based solely on his or her participation in a crime."
(§ 188, subd. (a)(3).)  The change eliminated liability for murder as an aider and abettor under the natural and probable consequences doctrine.  (*Curiel*, at p. 449; *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)

---

[3]    Specifically, SB 1437 added section 189, subdivision (e), providing liability only if the defendant was the actual killer, was not the actual killer but, with intent to kill, acted as a direct aider and abettor, or was a major participant in the underlying felony and acted with reckless indifference to human life.

4

A defendant convicted of felony murder under the prior law or murder based on the natural and probable consequences doctrine can petition to vacate the conviction and be resentenced on any remaining counts, if he could not now be convicted of murder because of the changes made by SB 1437. (§ 1172.6, subd. (a); *Lewis*, *supra*, 11 Cal.5th at pp. 959–960.) Upon receipt of a petition that contains all required information, the trial court must appoint counsel to represent the petitioner, if requested. (§ 1172.6, subd. (b)(3).) The court must also direct the prosecutor to file a response to the petition and permit the petitioner to reply. (*Ibid.*) If the court determines the petitioner has made a prima facie case for relief, it must issue an order to show cause and conduct an evidentiary hearing. (*Id.*, subds. (c) & (d)(1).)

The prima facie inquiry is limited. (*Lewis*, *supra*, 11 Cal.5th at p. 971.) The court takes the petitioner's factual allegations as true and refrains from factfinding. (*Id.* at p. 972.) "The record of conviction will necessarily inform the trial court's prima facie inquiry under section [1172.6], allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Id.* at p. 971.) " 'If the petition and record in the case establish conclusively that the [petitioner] is ineligible for relief, the trial court may dismiss the petition. [Citations.] If, instead, the [petitioner] has made a prima facie showing of entitlement to relief, "the court shall issue an order to show cause." (§ 1172.6, subd. (c).)' [Citation.]" (*Curiel*, *supra*, 15 Cal.5th at p. 450.)

Whether the record of conviction shows the petition is ineligible for section 1172.6 relief as a matter of law is a legal question that we review de novo. (*People v. Lopez* (2022) 78 Cal.App.5th 1, 14.)

## II. No Instruction on the Natural and Probable Consequences Doctrine

Rushing concedes that the trial court did not read either of the two instructions on the natural and probable consequences doctrine to the jury.  The trial court read CALCRIM No. 400 which defines the roles of the perpetrator and the aider and abettor.[4]  The trial court also included the optional bracketed language in CALCRIM No. 400 that stated, "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."  (CALCRIM No. 400.)  Rushing argues that this bracketed language allowed the jury to convict him of murder based on the natural and probable consequences doctrine.

*People v. Estrada* (2022) 77 Cal.App.5th 941, 946 (*Estrada*) rejected the same argument.  Our colleagues in Division Eight of this district concluded that the defendant was ineligible for section 1172.6 relief because the trial court did not instruct the jury on the natural and probable consequences doctrine, even

---

[4]  The version of CALCRIM No. 400 read to the jury stated: "A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.  A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."

In April 2010, the Judicial Council revised CALCRIM No. 400 to delete the word "equally" from the phrase that stated principals are "equally guilty" of a crime.  (See Judicial Council of Cal., Crim. Jury Instns. (April 2010 Supp.).)

though it read the bracketed language in CALCRIM No. 400. (*Estrada,* at p. 949.) The reviewing court determined that the bracketed language alone did not sufficiently instruct the jury on the natural and probable consequences doctrine. (*Id.* at p. 947 & fn. 4.) The CALCRIM bench notes directed that the bracketed language be read along with CALCRIM No. 402 or No. 403[5] when proceeding under the natural and probable consequences doctrine. (*Estrada,* at pp. 946–947, citing Judicial Council of Cal., Crim. Jury Instns. (2022) Bench Notes to CALCRIM No. 400.) But the trial court never instructed the jury on CALCRIM No. 402 or No. 403. (*Estrada*, at p. 946.) The prosecutor also never requested that the trial court read either to the jury. (*Id.* at p. 947.)

Instead, the trial court read CALCRIM No. 401, which described aiding and abetting intended crimes. (*Estrada*, *supra*, 77 Cal.App.5th at p. 947.) The reviewing court concluded that the jury instructions taken as a whole—including CALCRIM No. 401—permitted the jury to find the defendant guilty of first degree murder, as it did, only if it concluded that he acted with intent to kill. (*Estrada*, at p. 947.)

Similarly, at Rushing's trial, the court did not instruct the jury with CALCRIM No. 402 or 403. The bracketed language in CALCRIM No. 400 was not a self-contained instruction on the natural and probable consequences doctrine. It informed the jury

---

[5] CALCRIM No. 402 describes the natural and probable consequences doctrine when the target and non-target offenses are charged. CALCRIM No. 403 describes the natural and probable consequences doctrine when only the non-target offenses are charged.

of the possibility that a person may be found guilty of other crimes that occurred during the commission of the crime that he or she originally aided and abetted. But it did not discuss the specific circumstances under which this may occur. It was incomplete without CALCRIM No. 402 or 403. As in *Estrada*, CALCRIM No. 401 was the only complete instruction on accomplice liability that the trial court read to the jury.

Rushing attempts to distinguish *Estrada*. He points out that in *Estrada* the guilty verdict on first degree murder amounted to the jury's finding that the defendant acted with malice. The instructions required the jury to find Estrada acted with intent to kill to reach that verdict. (*Estrada*, *supra*, 77 Cal.App.5th at pp. 945–946.) Rushing contends that, unlike the first degree murder conviction in *Estrada*, his conviction for second degree murder "supports a reasonable possibility" that the jury did not find he acted with malice "and instead relied on the CALCRIM No. 400 bracketed language." We disagree.

It is true that in *Estrada*, the instructions permitted the jury to reach a guilty verdict on first degree murder only if it concluded the defendant acted with intent to kill. (*Estrada*, *supra*, 77 Cal.App.5th at p. 945.) The trial court instructed with CALCRIM No. 521 which discussed first degree murder based on deliberation and premeditation. (*Estrada*, at p. 948.) This type of murder requires intent to kill, as well as other elements that show preexisting reflection, actual deliberation, or forethought.[6]

---

[6] But simply having intent to kill does not necessarily amount to first degree murder. Express malice requires intent to kill. (§ 188, subd. (a)(2).) Deliberation and premeditation requires more than intent to kill. CALCRIM No. 521 states: "The defendant acted willfully if [he/she] intended to kill. The

(*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  Killing with deliberation and premeditation was the only theory for first degree murder on which the trial court instructed the jury.

The court in Rushing's trial similarly instructed on murder (CALCRIM No. 520), deliberation and premeditation (CALCRIM No. 521), general principles of aiding and abetting (CALCRIM No. 400), and aiding and abetting intended crimes (CALCRIM No. 401).  To convict Rushing of second degree murder, the trial court's instructions permitted the jury to find that he was a perpetrator[7] or a direct aider and abettor of express or implied malice murder.  The guilty verdict on second degree murder itself does not amount to a jury finding that Rushing was liable under the natural and probable consequences doctrine.  Nor does it suggest the jury relied on the bracketed language in CALCRIM No. 400.

defendant acted deliberately if [he/she] carefully weighed the considerations for and against [his/her] choice and, knowing the consequences, decided to kill.  The defendant acted with premeditation if [he/she] decided to kill before completing the act[s] that caused death."

An express malice murder committed without deliberation and premeditation is second degree murder.  (*People v. Rogers* (2006) 39 Cal.4th 826, 866.)

[7]     The trial court read CALCRIM No. 520, which required for a guilty verdict that the jury find "[t]he defendant committed an act that caused the death of another person," and "[w]hen the defendant acted, he had a state of mind called malice aforethought."

9

## III. Prosecutor's Closing Argument

Rushing contends that the prosecutor's closing argument permitted the jury to convict him of murder based on the bracketed language in CALCRIM No. 400. Specifically, Rushing claims the prosecutor separated the killing into two acts by stating, "[W]hen you intentionally commit an act such as taking your fists and your feet and kicking a 55-year-old man in the head and the body, you're intentionally committing an act, that beating. [¶] When you kick someone in the head, the natural consequences of that are dangerous to human life." According to Rushing, these statements defined the first act as an assault, which the prosecutor described as a "beating," and the murder was the second act which he pinpointed with one of Hubbard's kicks to Powe's head.

But by isolating these statements, Rushing ignores the context of the prosecutor's argument from which they were taken. In this portion of his closing argument, the prosecutor first discussed specific jury instructions read by the court about the law on murder, including the definitions of murder and express and implied malice. He proceeded to apply the facts of the case to the elements of implied malice murder.[8] Specifically, the prosecutor described the violent acts collectively committed by Rushing and Hubbard against Powe, causing his fatal head

---

[8]    Implied malice requires intentionally committing an act, the natural and probable consequences of which were dangerous to human life, and knowledge that the act was dangerous to human life, and deliberately acting with conscious disregard for human life. (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

10

injury.[9] The prosecutor also commented on the identical mental states of Hubbard and Rushing when they committed these acts, namely their knowledge of their acts' dangerousness to human life and their conscious disregard for human life.[10]

The prosecutor continued to discuss Rushing's and Hubbard's collective acts and identical mental states when he argued they were guilty of willful, deliberate, and premeditated murder. He described how each of the many violent acts was comprised of deliberate movements.[11] He commented that

---

[9] The prosecutor stated: "Everyone knows that when you do that and when you take a head of—as they did with Gregory Powe, and throw that on the asphalt in that street to the point where [a witness] could hear the pop and the crack of his skull . . . that big cracked open gash in the back of Gregory Powe's head—that act, the consequences are dangerous to human life."

[10] The prosecutor argued: "The head is one of the most sensitive parts of your body. And those acts that these two individuals did to Mr. Powe on that evening are dangerous to human life. [¶] They certainly had knowledge of this, and knowledge could be shown circumstantially. [¶] They aimed for his head. While he was down on his knees, they beat him even further, and they continued this act especially on Hood Day. [¶] . . . [¶] And they acted with conscious disregard. They didn't stop. They aimed for the head. They kept on hitting him. They kicked him. And it ended with Mr. Hubbard taking his head and throwing it on the ground. [¶] Murder, killing of another human being with malice, that can be shown in two ways: express malice, which is obvious intent to kill; and implied malice, which can also be shown as I've demonstrated."

[11] The prosecutor stated, "[E]very time that Mr. Rushing and Mr. Hubbard [clenched] their fists, pulled back and decide[d] to

---

Rushing and Hubbard consciously decided to commit these violent acts when they could have stopped at any time.[12]

Based on the prosecutor's discussion that followed the statements highlighted by Rushing and the context from which they were taken, the jury would not have separated the acts into a beating and a killing to apply the natural and probable consequences doctrine. The prosecutor was only applying the law on implied malice and deliberation and premeditation to the factual scenario of Rushing's and Hubbard's collective acts in attacking Powe. When making these arguments, he never mentioned aiding and abetting or the natural and probable consequences doctrine. When the prosecutor finally discussed aiding and abetting, he limited his comments to direct aiding and abetting.[13] This portion of the closing argument, like the other

hit Mr. Powe in the head, that was deliberate. They thought about that. Okay? They didn't just do it once or two times or three times. They did it many times."

[12] The prosecutor stated: "Every time they decided to take their [feet] back and extend [them] and aim at his head or when they decide to take his head and throw it back on the ground, these were all conscious decisions, ladies and gentlemen. They could have stopped any of these at any time, but they didn't. They decided to do it over and over again and they decided to act in concert. That's why this is first-degree murder."

[13] The prosecutor stated: "The final concept I want to talk to you about is aiding and abetting. Now, a person could be guilty of a crime in two ways. They could be a direct perpetrator of the crime or they could aid and abet someone else who committed a crime. Okay? Again, for example—and I give extreme examples to demonstrate this point. [¶] The person who pulls a trigger and shoots someone in the head, he's a direct perpetrator of a crime.

parts, did not permit the jury to impute malice to Rushing based on any isolated segment of the beating. The prosecutor's closing argument does not change our conclusion that the entirety of the record conclusively establishes that Rushing is ineligible for section 1172.6 relief. (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

---

Okay? But the person who maybe bought the gun for him, gave it to him and said you should go kill this person on such and such date. I made sure to leave the door open so you could get into the house and kill them, okay, he's aiding and abetting that murder. He may not have even been at the crime scene, or he may have. Maybe he went and drove him there. But he wasn't the person who pulled the trigger. However, the law says he's just as guilty and culpable as the person who does."

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


HANASONO, J.*


We concur:



EGERTON, Acting P. J.



ADAMS, J.


_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14

Filed 3/20/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CORY T. RUSHING,<br><br>  Defendant and Appellant. | B334988<br><br>(Los Angeles County<br>Super. Ct. No. TA097346)<br><br>**Order Certifying Opinion for Publication**<br><br>[No change in judgment] |

THE COURT:

The opinion in the above-entitled matter filed on February 27, 2025, was not certified for publication in the Official Reports. Upon request by respondent and for good cause, it now appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The opinion is ordered published in the Official Reports.

EGERTON, Acting P. J.　　　ADAMS, J.　　　HANASONO, J.*

_____

\*　　Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.